H. Dickson Burton (4004)
hdburton@traskbritt.com
Daniel Bezdjian (14597)
djbezdjian@traskbritt.com
TRASKBRITT, PC
P.O. Box 2550
230 South 500 East, Suite 300
Salt Lake City, Utah 84110
Telephone:  (801) 532-1922

Robert J. Theuerkauf (KY 89068) (*pro hac vice*)
rtheuerkauf@middletonlaw.com
Daniel W. Redding (KY 93234) (*pro hac vice*)
dredding@middletonlaw.com
MIDDLETON REUTLINGER
401 South Fourth Street - Suite 2600
Louisville, Kentucky 40202
Telephone: (502) 584-1135
Fax: (502) 561-0442
*Attorneys for Defendants Frank Nye*
*Consulting, LLC d/b/a The Arctic Scoop,*
*Frank Nye, Individually, and Alison Nye, Individually*

## IN THE UNITED STATES DISTRICT COURT
## THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SUB ZERO FRANCHISING, INC., a Utah corporation,<br><br>           Plaintiff/Counterclaim<br>           Defendant<br><br>     v.<br><br>FRANK NYE CONSULTING, LLC, d/b/a THE ARCTIC SCOOP, a Kentucky limited liability company,<br>FRANK NYE, an individual, and<br>ALISON NYE, an individual,<br><br>           Defendants/Counterclaimants | **DEFENDANTS' MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 11 AND 28 U.S.C. § 1927 AND MEMORANDUM OF LAW IN SUPPORT**<br><br>**Case No. 2:15-cv-00821-BSJ**<br><br>**Honorable Judge Bruce S. Jenkins** |

## <u>TABLE OF CONTENTS</u>

PRECISE RELIEF SOUGHT AND GROUNDS FOR THE MOTION ........................................v

FACTUAL BACKGROUND ................................................................................... vii

    A. THE ALLEGATIONS AND CLAIMS IN THE ORIGINAL COMPLAINT ............... vii

    B. SUB ZERO AND KIRTON MCCONKIE'S CONDUCT LEADING TO THE
       AMENDED COMPLAINT ......................................................................... ix

    C. KIRTON MCCONKIE WITHHOLDS INFORMATION IN DISCOVERY WHICH
       CONCEALS RULE 11 VIOLATIONS AND UNNECESSARILY PROLONGS THE
       CASE ...................................................................................................... xii

    D. DEPOSITIONS OF SUB ZERO'S ONLY OFFICER AND CORPORATE
       REPRESENTATIVE REVEAL RULE 11 VIOLATIONS ...............................xv

    E. THE DEPOSITIONS OF THE BARTHS CONFIRM THE LACK OF GOOD FAITH
       BASIS FOR SUB ZERO'S TRADE SECRET AND CONTRACT CLAIMS............. xxi

    F. RECENT PROCEDURAL HISTORY ........................................................xxv

ARGUMENT .........................................................................................................1

    I. KIRTON MCCONKIE COMMITTED NUMEROUS RULE 11 VIOLATIONS IN
       SIGNING AND FILING THE COMPLAINT AND AMENDED COMPLAINT......1

       1. Statements Regarding Ownership Of The '566 Patent In The Complaint ............3

       2. Statements Regarding Ownership Of Both Patents At Issue In The Amended
          Complaint .................................................................................................4

       3. Allegations Of Breach Of Contract And Misappropriation Of Trade Secrets In
          The Complaint And Amended Complaint............................................................6

    II. KIRTON MCCONKIE'S POST-COMPLAINT CONDUCT VIOLATED 28
       U.S.C.§ 1927 ...........................................................................................10

    III. DEFENDANTS ARE ENTITLED TO THEIR ATTORNEYS' FEES INCURRED
       IN THIS CASE AS SANCTIONS ...........................................................17

CONCLUSION.....................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                 **Page(s)**

*Adamson v. Bowen*, 855 F.2d 668, 672-673 (10th Cir. 1988)....................................................1, 2

*Bains Ultra Inc. v. 7677 East Berry Ave. Associates, LP*, No. 08-cv-02021, 2009 WL 347476, at
   *2 (D. Colo. Feb. 10, 2009)....................................................................................................2

*Braley v. Campbell*, 832 F.2d 1504, 1512-1513 (10th Cir. 1987) ........................................10, 11

*Brubaker v. City of Richmond*, 943 F.2d 1363, 1373 (4th Cir. 1991)...........................................2

*Business Guides, Inc. v. Chromatic Communications Enter., Inc.*, 498 U.S. 533, 551 (1991) .....2

*Carl Zeiss Vision Int'l GMBH v. Signet Armorlite, Inc.*, 2009 WL 10668689, No. 07-cv-0894,
   at *3-4 (S.D. Cal. Mar. 17, 2009)............................................................................................3

*Clark v. The Walt Disney Co.*, 748 F. Supp. 2d 792, 801-02 (S.D. Ohio 2010)...........................3

*Cook v. Rockwell Intern. Corp.*, 147 F.R.D. 237, 246 (D. Colo. 1993).........................................2

*Dreiling v. Peugeot Motors of Am., Inc.*, 768 F.2d 1159, 1162-63, 1165-66 (10th Cir. 1985) ...11

*Dominion Video Satellite, Inc. v. Echostar Satellite L.L.C.*, 430 F.3d 1269, 1278
   (10th Cir. 2005) ......................................................................................................................10

*Hamilton v. Boise Cascade Exp.*, 519 F.3d 1197, 1200-1205 (10th Cir. 2008) .............10, 11, 17

*Homecare CRM, LLC v. Adam Group, Inc. of Mid. Tenn.*, 952 F. Supp. 2d 1373, 1380-84
   (N.D. Ga. 2013) ......................................................................................................................6, 7

*Schrag v. Dinges*, 73 F.3d 374 (unpublished), 1995 WL 675475, at * 10, 13 (10th Cir.
   Nov. 14, 1995)......................................................................................................................3, 13

*Steinert v. Winn Grp., Inc.*, 440 F.3d 1214, 1224-1225 (10th Cir. 2006)..............................10, 13

*Thommen Medical USA, LLC v. Tanner*, No. 11-cv-03010, 2014 WL 4494815, at * 2-4 (D. Colo.
   Sep. 12, 2014)..........................................................................................................................11

*View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986 (Fed. Cir. 2000).......................2

*White v. General Motors Corp., Inc.*, 908 F.2d 675, 680-681 (10th Cir. 1990)...............1, 2, 5, 6

**Statutes**

28 U.S.C. § 1927.......................................................................v, vii, 10, 11, 12, 14,16, 17, 18, 19

**Rules**

FRCP 11....................................v, vi, vii, xii, xiii, xiv, xv, xxi, 1, 2, 3, 9, 10, 14, 15, 16, 17, 18, 19

FRCP 11(b) ..........................................................................................................................1, 2

FRCP 11(b)(1) ...................................................................................................................xiii, 1

FRCP 11(b)(2) ...............................................................................................................xiii, 4, 6

FRCP 11(b)(3) .........................................................................................................xiii, 3, 4, 6, 8

FRCP 11(c) ............................................................................................................................1

FRCP 11(c)(4) ......................................................................................................................17

FRCP 26 ...............................................................................................................................xv

FRCP 26(a) .....................................................................................................................xv, 16

FRCP 26(a)(1)(A) ..........................................................................................................xii, xiv

LPR 2.2(a)..................................................................................................xii, xiv, xv, 12, 13

LPR 2.2(a)(4) .......................................................................................................................xii

**PRECISE RELIEF SOUGHT AND GROUNDS FOR THE MOTION**

Defendants Frank Nye Consulting, LLC d/b/a The Arctic Scoop (the "Arctic Scoop"),

Frank Nye ("Frank Nye"), and Alison Nye ("Alison Nye") (collectively "Defendants"), by

counsel, pursuant to Fed. R. Civ. P. 11 (sometimes hereafter "Rule 11") and 28 U.S.C. § 1927,

respectfully move the Court for the imposition of sanctions against the attorneys ("Kirton

McConkie") for Plaintiff Sub Zero Franchising, Inc. ("Sub Zero") and/or Sub Zero.[1]  Defendants

request that Kirton McConkie and/or Sub Zero be ordered to pay Defendants' reasonable

attorneys' fees incurred in this action.  These fees which were generated solely as a result of Sub

Zero and Kirton McConkie's misconduct in bringing and maintaining this action.

Kirton McConkie committed violations of Rule 11 with respect to each claim asserted

against Defendants in Sub Zero's Complaint and Amended Complaint.  It then actively

concealed such violations by withholding documents and information and continued to pursue

these claims with knowledge of their lack of basis for approximately 1.5 years in violation of 28

U.S.C. § 1927, which prohibits unreasonable multiplication and prolonging of proceedings.

Kirton McConkie's violations of Rule 11 and 28 U.S.C. § 1927 include:

- Falsely stating in the original Complaint that Sub Zero was the owner by assignment of
  U.S. Patent No. 8,679,566 ("the '566 Patent"), when Sub Zero had no rights whatsoever
  in this patent.

- Pursuing a claim of infringement of the '566 Patent for 1.5 years with knowledge that
  Sub Zero never had standing to bring or pursue such a claim.

- Drafting a series of purported limited assignments four months after the filing of the
  Complaint, which purported to assign the '566 Patent and U.S. Patent 7,455,868 ("the
  '868 Patent") (collectively, "Patents at Issue") from the inventors to a holding company
  and then to Sub Zero.  These assignments were invalid and further conclusively
  demonstrate that Kirton McConkie was aware of the false statements in the original

---

[1] The violations of Rule 11 and 28 U.S.C. § 1927 described herein appear to have been committed by Kirton
McConkie.  To the extent the Court determines that Plaintiff Sub Zero is responsible for any such violations,
Defendants seek sanctions against Sub Zero and Kirton McConkie, jointly and severally.

Complaint and Sub Zero's lack of standing, which it failed to bring to the attention of the Court or Defendants.

- Asserting claims for infringement of the '566 and '868 Patents in the Amended Complaint based on the purported assignments that Kirton McConkie admits were invalid.

- Deliberately withholding these purported assignments and related documents from production until March 23, 2017, actively preventing Defendants from learning of Sub Zero's lack of standing and the false allegations of ownership of patent rights.  These documents were subject to mandatory disclosure no later than September 2016.

- Opposing Defendants' March 2017 Motion to Dismiss, including filing a motion for leave to file a second amended complaint to attempt to avoid dismissal, based on a concocted and legally irrelevant argument that Sub Zero was the oral, "exclusive licensee" of the '566 Patent as of the date of the original Complaint – a narrative that is contradicted by Sub Zero's own filings, documents, and correspondence.

- Asserting claims in the original Complaint and Amended Complaint for breach of a non-disclosure agreement and misappropriation of trade secrets based on factual allegations that Sub Zero knew of confidential information and trade secrets directly provided to Defendants by Sub Zero and its franchisees.  Sub Zero had no such knowledge or any evidence to support these factual allegations.

- Similarly alleging without any knowledge or evidence that Sub Zero and its franchisees knew of confidential information and trade secrets misappropriated and used by Defendants in the operation of their store, the Arctic Scoop.

- Failing to conduct any reasonable pre-suit investigation into the trade secret or contract claims – Kirton McConkie first investigated these allegations almost a year after filing the Complaint, at which point there is no doubt it knew of the lack of evidence to support these claims, and continued to pursue them anyway.

- Improperly pursuing these claims for 1.5 years despite an admitted lack of any evidence to support them.

- Improperly prolonging these claims by, among other actions: (1) falsely identifying at least three Sub Zero witnesses as having knowledge to support these claims in September 2016 initial disclosures; and (2) withholding until March 23, 2017 documents and information that would have put Defendants on notice of the lack of evidence in Sub Zero's possession to support these claims.

Defendants repeatedly notified Kirton McConkie throughout these proceedings that it appeared Kirton McConkie was in violation of Rule 11, notices that were ignored.  Defendants

were only able to confirm Kirton McConkie's violations and learn the full extent of its misconduct in March and April 2017 because Kirton McConkie withheld mandatory discovery and otherwise misled Defendants and the Court.  All of Defendants' attorneys' fees in this case were incurred as direct result of Kirton McConkie's violations of Rule 11 and 28 U.S.C. § 1927.  Accordingly, Defendants respectfully request that the Court award Defendants their reasonable attorneys' fees and costs incurred in this case as sanctions.  Defendants will submit proof of such reasonable fees and expenses upon an award from this Court.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.       The Allegations and Claims in the Original Complaint

Sub Zero filed its original Complaint against Defendants on November 19, 2015, asserting claims for breach of a non-disclosure agreement (the "NDA") (and a concomitant breach of the covenant of good faith and fair dealing), misappropriation of trade secrets under the Uniform Trade Secrets Act, and infringement of the '566 Patent.[2]  *See* DN 2.  The Complaint was signed by Kirton McConkie.

Sub Zero based its claim of infringement of the '566 Patent on the repeated allegation that "Sub Zero is the owner of the right to enforce the '566 Patent against the Defendants by assignment."  *See* DN 2, ¶¶ 21, 46.  This statement was false, as the Court is aware from Defendants' recent Motion to Dismiss (DN 36).  Sub Zero had no rights whatsoever in the '566 Patent at this time, was not the assignee of the '566 Patent, and had no basis for such an assertion.

---

[2] The '566 Patent is directed to a specific method of preparing ice cream using liquid nitrogen by hand, including a number of specific steps such as dispensing a predetermined amount of liquid nitrogen, allowing crust layers to form, breaking such crust layers, and then plowing successive crust layers.  *See* '566 Patent, attached hereto as Exhibit ("Ex.") 1.

Sub Zero's causes of action for breach of the NDA and misappropriation of trade secrets arose from similar allegations.  In 2013, Frank and Alison Nye, who were contemplating opening an ice cream store, communicated with Sub Zero regarding becoming a franchisee of Sub Zero. As part of these discussions, the Nyes were requested to execute the NDA.  *See* NDA (Ex. 2). The NDA prohibited the Nyes from disclosing or using certain confidential information received from Sub Zero, such as "proprietary ideas, trade secrets, business, products, recipes, technology, customers, finances, plans, proposals, or practices of [Sub Zero]…"  Ex. 2, ¶ 1.  The NDA also contains a venue selection clause requiring any dispute relating to the NDA to be brought in Utah County, Utah.  *See id*., ¶ 6.4.  The parties ultimately could not agree on a franchise agreement, and in late 2013 the discussions ceased.  Thereafter, the Nyes learned a process for making ice cream using liquid nitrogen from a Florida proprietor, John Eustace, and opened their own store, the Arctic Scoop, in Louisville, Kentucky, in September 2014.[3]

In the Complaint, Sub Zero alleged that "[p]ursuant to the NDA . . . Sub Zero disclosed confidential and trade secret information to the Defendants both directly and through other franchisees of Sub Zero."  *Id*. at ¶ 16.   As later identified in discovery, the "franchisees" whom allegedly provided such confidential and trade secret information to the Nyes were Jason and Melissa Barth, individuals who owned and operated a Sub Zero franchise in Indianapolis, Indiana.  The Nyes had some limited communication with these franchisees in 2013 regarding Sub Zero franchise ownership, including a tour of their franchise location.  In the Complaint, Sub Zero further alleged that Defendants used the confidential information and trade secrets disclosed to them by Sub Zero and/or its franchisees when they began operating the Arctic Scoop, purportedly breaching the NDA.  *Id*. at ¶¶ 19, 30.  None of these allegations or the remaining

---

[3] Defendants notified Sub Zero at a February 2015 mediation, long before the Complaint was filed, that they had been trained on this process by Mr. Eustace, not Sub Zero or its franchisees.

allegations related to this cause of action (*see* DN 2, ¶¶ 15-19, 27-34) were made upon information and belief.  None of Sub Zero's factual contentions were identified as requiring a reasonable opportunity for further investigation or discovery.

These same allegations purportedly gave rise to Sub Zero's claim for misappropriation of trade secrets under the Uniform Trade Secrets Act.  *See* DN 2, ¶¶ 35-44.  Sub Zero alleged that Defendants received trade secrets from Sub Zero and/or one of its franchisees pursuant to the NDA, and that Defendants used such trade secrets and "methods of operation" disclosed to them, constituting misappropriation of trade secrets.  *See id*., ¶¶ 36-38.  Sub Zero further alleged that such misappropriation in violation of the NDA was knowing, willful and malicious.  *Id*. at ¶ 43.  None of these allegations or the remaining allegations related to this cause of action (*see* DN 2, ¶¶ 15-19, 35-44) were made upon information and belief or identified as requiring a reasonable opportunity for further investigation or discovery.

All of these allegations were premised on information and evidence purportedly already in Sub Zero's possession, as Sub Zero claimed that it and its franchisees had provided trade secrets and confidential information directly to Defendants, and further knew of Defendants' use of such information.  The Complaint did not identify any trade secret or confidential information actually provided to, or misappropriated by, Defendants.

**B.**     **Sub Zero and Kirton McConkie's Conduct Leading to the Amended Complaint**

On March 15, 2016, Jerry Hancock, the sole officer, board member and founder of Sub Zero,[4] and the named inventor of the '566 Patent to whom the patent issued, executed a series of purported "assignments," which were drafted by Kirton McConkie.[5]  Mr. Hancock, in his

---

[4] *See* 30(b)(6) Deposition of Sub Zero ("30(b)(6) Depo"), relevant pages of which are attached hereto as Ex. 3, p. 123; Deposition of Jerry Hancock ("Hancock Depo'), relevant pages of which are attached hereto as Ex. 4, p. 159.
[5] *See* 30(b)(6) Depo, pp. 101-04 (identifying Kirton McConkie as drafter).

individual capacity, purported to assign the right, title, and interest in the '566 Patent from himself to a company called Sub-Nitro, LLC ("Sub Nitro"), for the purpose of "enforcing via actual or threatened litigation certain intellectual property rights." *See* Agreement (Ex. 5). In this same Agreement, Rob Kennedy, a named inventor of the '868 Patent,[6] in his individual capacity, purported to assign the right, title, and interest in the '868 Patent to Sub Nitro for this same purpose. *See id*.

On this same date, Sub Nitro executed a purported "Assignment of Patent Rights," to Sub Zero. *See* "Assignment of Patent Rights" (Ex. 7). In this document, drafted by Kirton McConkie and signed by Hancock on behalf of both entities, Sub Nitro purported to assign to Sub Zero "all right, title, and interest to enforce" the Patents at Issue against only the three Defendants in this case. *Id*. As acknowledged by Kirton McConkie in recent briefing (*see* DN 44, pp. 5-6), this attempted assignment was legally ineffective. These documents – executed four months after the Complaint was filed – show counsels' complete awareness of the false allegation of Sub Zero's ownership of the '566 Patent.

Kirton McConkie did not notify the Court that it had violated its duty of candor or Rule 11, or that the allegation in the original Complaint regarding assignment of the '566 Patent was false. Despite having yet to even serve[7] Defendants with the Complaint, Kirton McConkie made no effort to address this issue. Instead, Kirton McConkie, on behalf of Sub Nitro, began sending out demand letters to third parties identifying Sub Nitro as the entity which "owns and licenses"

---

[6] The '868 Patent is directed to an apparatus and method for "mechanically mixing the ingredients" to create ice cream using liquid nitrogen, and Mr. Kennedy sells and licenses a machine for making ice cream using liquid nitrogen. *See* '868 Patent (Ex. 6).

[7] Kirton McConkie did not serve Defendants until after the Court issued a Show Cause Order (DN 7) on April 26, 2016. Kirton McConkie filed a response (DN 8) on May 2, 2016, informing the court that "[a]fter further research, counsel for Plaintiff located a business address for Defendants" and was able to serve Defendants. Kirton McConkie made this representation despite correspondence showing that Sub Zero was aware of Defendants' business address as early as 2014. *See* September 2014 email chain (Ex. 8) at SZ 3802.

the Patents at Issue, and offering to negotiate a license with such third parties. *See* May – July 2016, correspondence (Ex. 9). These letters were not produced until March 23, 2017.

On May 25, 2016, after service and an opportunity for an initial investigation, Defendants notified Kirton McConkie that there was no apparent legal basis for any of Sub Zero's claims, and called into question Kirton McConkie's pre-suit investigation. *See* May 25, 2016 correspondence (Ex. 10). Defendants pointed out that the Arctic Scoop's publicly visible process was the same method for preparing ice cream that had existed in the prior art for decades, and did not infringe the process claimed in the '566 Patent. *Id.* Further, that Defendants' initial investigation had disclosed that there was not "any basis for [the trade secret or contract claims] or any allegation that Frank or Alison Nye improperly used any confidential or proprietary material obtained from Sub Zero." *Id.* Defendants requested identification in detail of Sub Zero's infringement position and the alleged trade secret misappropriated. Kirton McConkie ignored this request. Instead, it responded over a month later with a draft amended complaint, informing Defendants that Sub Zero had acquired the right to enforce the '868 Patent and reiterating its earlier interest in settlement negotiations. *See* July 11, 2016 correspondence (Ex. 11).

Defendants responded on July 19, 2016, once again calling into question Kirton McConkie's pre-suit investigation, in this case because the '868 Patent is directed to mixing ingredients with a powered mixer or other machine, and the Arctic Scoop's process is carried out by hand. *See* July 19, 2016 correspondence (Ex. 12).[8]

---

[8] Further settlement correspondence in July and August 2016 proved unsuccessful, with Kirton McConkie unsuccessfully attempting to exert leverage such as "the cost to your clients to invalidate the patents" exceeding the cost of a settlement. *See* August 5, 2016 correspondence (Ex. 13).

Sub Zero responded by moving for leave to file the Amended Complaint on July 25, 2016, which was filed on August 15, 2016.  *See* DN 17.  In addition to adding a claim for infringement of the '868 Patent, the Amended Complaint reiterated the allegations of the original Complaint with respect to Sub Zero's trade secret and contract claims.  *Id*.  The Amended Complaint also reiterated the allegations that Sub Zero was the owner of the right to enforce the '566 Patent by assignment, and further alleged that Sub Zero was the owner of the right to enforce the '868 Patent by assignment.  *See* DN 17, ¶¶ 21, 26, 49, 56.   In Kirton McConkie's own words on May 15, 2017 (DN 44), these allegations of ownership were allegedly "mistaken," because the purported assignments to Sub Zero were "legally ineffective."

## C.   Kirton McConkie Withholds Information in Discovery Which Conceals Rule 11 Violations and Unnecessarily Prolongs the Case

Kirton McConkie's conduct in discovery prevented Defendants from learning that Sub Zero's claims and allegations were without basis.  On September 21, 2016, Sub Zero served its Initial Disclosures, signed by Kirton McConkie.  *See* initial disclosures (Ex. 14).  Sub Zero identified Jerry Hancock as having "information regarding Sub Zero's trade secrets, Defendants' misappropriation, and Defendants' communications with plaintiff."  *Id*. at 2.  These disclosures further identified Jason and Melissa Barth as witnesses with "[k]nowledge of facts and circumstances surrounding disclosure of Sub Zero's trade secret information to Defendants."  *Id*. at 4.  Pursuant to LPR 2.2(a)(4), Sub Zero was required to disclose "all documents concerning ownership of the patent rights by the party asserting infringement," which would certainly include the purported March 2016 assignments.  Sub Zero's initial disclosures stated that such documents existed and were located at Kirton McConkie's offices.  *Id*. at 6.  Despite subsequent, repeated requests from Defendants for all documents responsive to the categories identified in FRCP 26(a)(1)(A) and LPR 2.2(a), Sub Zero did not produce these documents.

On October 31, 2016, Sub Zero served its purported trade secret contentions pursuant to the Court's scheduling order that required identification "with particularity the trade secret allegedly misappropriated." DN 31. Sub Zero's trade secret contentions failed to identify any confidential or trade secret information allegedly misappropriated, instead asserting broad, generic categories of information such as (1) "information regarding suppliers of ingredients and materials other than nitrogen," (2) "information regarding obtaining a proper supply of liquid nitrogen," (3) "information regarding designing and operating a nitrogen ice cream store," and (4) "information visible in non-public locations…." *See* contentions (Ex. 15).

Given the numerous issues with all of Sub Zero's claims and allegations, including this failure to articulate even a cognizable trade secret, Defendants sent formal correspondence to Kirton McConkie on November 18, 2016 pursuant to Rule 11. *See* correspondence (Ex. 16). Defendants stated that it appeared Kirton McConkie had failed to conduct a reasonable pre-suit investigation in violation of Rule 11(b)(3) with respect to any of its asserted claims, and that its pursuit of objectively baseless and unreasonable patent claim constructions and infringement positions also violated Rule 11(b)(2). *Id.* at 1-4. Further, it appeared Kirton McConkie had brought this suit to coerce Defendants into a license or franchise relationship in violation of Rule 11(b)(1). *Id.* at 1.

In this Rule 11 letter, Defendants also responded to Sub Zero's trade secret contentions that "such information does not qualify as trade secret because it is publically available, has no independent economic value, and/or is readily ascertainable through proper means." Regardless, there was "no good faith basis to claim Defendants have misappropriated any such information because Defendants only use information that is publically available or was independently developed." *See id.* p. 4. Defendants requested that Sub Zero dismiss its claims, and advised

Kirton McConkie that Defendants would seek sanctions and their reasonable attorneys' fees at the appropriate time. *Id*.

After multiple requests, Kirton McConkie responded to Defendants' Rule 11 letter on January 24, 2017, reasserting its prior positions regarding the Patents at Issue and now accusing Defendants of violating Rule 11. *See* correspondence (Ex. 17). Admitting Sub Zero had no basis for the trade secret claim, Kirton McConkie "respectfully note[d] that we are early in discovery…. If, upon completion of reasonable discovery . . . we are able to verify that Defendants have not misappropriated Sub Zero's trade secrets, we will act to voluntarily dismiss the trade secret cause of action. To date, the trade secret claim has been pursued subject to the requirements of Rule 11." *Id*. at p. 5. As a result of Sub Zero's refusal to dismiss its claims, Defendants were forced to move forward in discovery, particularly in light of the March 13, 2017 deadline for written discovery and April 12, 2017 deadline for fact discovery. *See* DN 31.

Defendants made no less than six requests for documents responsive to LPR 2.2(a) and FRCP 26(a)(1)(A) between November and February 2017, including a call with Kirton McConkie on January 23, 2017 where Kirton McConkie stated that during that same week it was confirming that all documents responsive to the initial disclosure requirements had been produced.[9] Sub Zero made piecemeal productions on December 8, 2016, January 27, and February 6, 2017 of documents purportedly responsive to Sub Zero's initial disclosure obligations. These documents consisted primarily of the file history for the Patents at Issue, documents purportedly demonstrating conception and reduction to practice, and franchise agreements. Defendants notified Sub Zero on February 6, 2017 that they would "operate under the assumption that, outside of additional franchise agreements which we have requested and you

---

[9] *See* November – January email correspondence (Ex. 18); January – February email correspondence (Ex. 19).

have agreed to produce, Sub Zero does not have any additional documents in its possession, custody or control that are responsive to the categories in LPR 2.2(a), or which should otherwise . . . be subject to discovery as part of Sub Zero's initial disclosures pursuant to FRCP 26." *See* Ex. 19. Sub Zero made an additional production of franchise agreements on February 15. It never informed Defendants that there were any additional documents responsive to LPR 2.2(a) or FRCP 26(a) in Sub Zero's possession, custody or control.

The Arctic Scoop served comprehensive written discovery requests on February 8, 2017. Sub Zero served written responses and produced documents on March 17, 2017. This production did not include the purported assignments or demand letters, despite being squarely responsive to multiple requests for production. *See* discovery responses, attached hereto as Ex. 20, RFP 38-40.

## D. Depositions of Sub Zero's Only Officer and Corporate Representative Reveal Rule 11 Violations

Defendants took the deposition of Mr. Hancock on March 22, 2017 and the corporate representative deposition of Sub Zero on March 23, 2017, which was also Mr. Hancock. Mr. Hancock had no concept of the requisite legal or factual elements of any of Sub Zero's asserted claims,[10] and his testimony further revealed that Kirton McConkie had withheld documents and lacked a good faith basis for numerous allegations in the Complaint and Amended Complaint.

Mr. Hancock testified on March 22 that Sub Zero is not the assignee of the '868 Patent, and that instead Sub Nitro was the assignee of the '868 Patent. *See* Hancock Depo, pp. 200-01. Mr. Hancock could not identify any relationship between these two entities. *See id*. at 201-02. This was the first time Defendants had heard of Sub Nitro or that Sub Zero was not the assignee

---

[10] While Sub Zero's patent infringement claims were dismissed for lack of standing, Mr. Hancock had no concept of the requirements for proving infringement on the merits. He repeatedly asserted that the claim language of the '566 Patent was irrelevant and anyone who prepared ice cream using liquid nitrogen by hand that was not a franchisee was an "infringer." Hancock Depo, pp. 35-37. He further testified that he believed his patent, coupled with the '868 Patent, meant he was entitled to monopolize the industry. *Id*. at 164-65.

of any of the Patents at Issue.  While Kirton McConkie promised on March 22 to produce outstanding documents that evening regarding Sub Nitro, it did not do so.

Instead, Kirton McConkie waited and produced a number of documents during the 30(b)(6) deposition on March 23.  These included the purported assignment documents and the Sub Nitro cease and desist letters, which demonstrated: (1) that the allegations in the original Complaint that Sub Zero was the assignee of the '566 Patent were false, rendering this claim subject to immediate dismissal for lack of standing; and (2) that Sub Zero lacked standing to assert the '868 Patent on the date of the Amended Complaint, given that the purported limited assignment of the Patents at Issue from Sub Nitro to Sub Zero of the right to sue only three parties (Ex. 7) was invalid.  *See* DN 36.  Mr. Hancock, as Sub Zero's corporate representative, could not offer any testimony regarding the purported assignments and had no concept of the party that was the assignee of the Patents at Issue.  *See* 30(b)(6) Depo, pp. 13-19.  Indeed, he testified that he believed that when the Amended Complaint referred to Sub Zero as the owner of the right to enforce the '868 Patent against Defendants, it actually referred to Sub Nitro rather than Sub Zero.  *Id*. at 16.  There is no reference to Sub Nitro in the Amended Complaint.  DN 17.

Making Kirton McConkie's failure to produce these documents even more serious, Mr. Hancock testified that Kirton McConkie originally drafted these documents.  *See* 30(b)(6) Depo, pp. 103-04.  He further testified that he had sent copies to Kirton McConkie when he gathered documents in response to the Arctic Scoop's discovery requests.  *Id*. at 14.

Contrary to the statements in Sub Zero's initial disclosures, Mr. Hancock, as Sub Zero's corporate representative, also had no knowledge of any confidential or trade secret information given to the Nyes, much less any misappropriation.  At his deposition, after having earlier testified that he "taught" the Nyes how to make ice cream, Mr. Hancock testified that was not a

true statement, and that he had never communicated with the Nyes outside of a February 2015

mediation.  Hancock Depo, pp. 217-218.  Instead, the Nyes had communicated with Jason and

Melissa Barth.  *Id.*  When asked about his knowledge of Jason and Melissa Barth's

communications with the Nyes, Mr. Hancock could only offer that he knew the Barths had

"allowed the Nyes behind the counter with video and a camera,"[11] and while  he "suspect[ed]"

the Barths "probably told them about nitrogen usage, costing, inventory . . . supply chain ….

where to get cream [and] where to get the nitrogen," he did not know what the Barths

communicated to the Nyes.  *Id.* at 219; *see also* p. 221 ("I don't remember what exactly they said

. . . I do know they took them behind the counter.  I do know they did have the camera.  I do

know that they took - - that they videotaped making the ice cream with the Barths - - while the

Barths explained the process.  I do know that.  Q: Do you know anything else? A: No.").  Mr.

Hancock further testified that he would have to refer back to email communications with the

Barths that identified the information provided to the Nyes (*id.* at 219-220), and specifically

referenced a consolidated document containing all email communications with the Barths.  *Id.* at

110.  This document, purportedly forming the evidentiary basis for these claims, had also been

withheld by Kirton McConkie and was not produced until the deposition on March 23.

At the March 23, 2017 corporate representative deposition, Mr. Hancock confirmed his

and Sub Zero's lack of any knowledge or evidence to support the trade secret and contract

claims, completely contradicting Sub Zero's initial disclosures.  Mr. Hancock testified that the

Barths were the only source of purported trade secret or confidential information provided to the

Nyes.  30(b)(6) Depo, pp. 40-41.  He once again testified that such information was recorded by

the Barths in email communications.  *Id.* at 40.  He further testified that he had no knowledge of

---

[11] In November 2016, Defendants produced the pictures taken during this visit, which do not show any confidential
or proprietary information accessed by Defendants.

the information provided to the Nyes by Sub Zero franchisees ("I don't know.  Unlike the NSA, we don't monitor their email").  *Id*. at 30.

When asked if he was "aware of whether the Nyes actually used any of this information that you contend constitutes a trade secret," Mr. Hancock responded: "That's really a specific question we need to ask the Barths," and further "I have no idea - - I have no idea.  How would I know that?"  *Id*. at 50.  For each category of purported trade secrets identified in Sub Zero's trade secret contentions, Mr. Hancock, as corporate representative of Sub Zero, confirmed that he had no knowledge of whether any such information was used by Defendants.  *Id*. at 50, 53, 55, 57.  This testimony completely contradicted the description of Mr. Hancock's knowledge in Sub Zero's Initial Disclosures signed by Kirton McConkie, as well as the allegations in the Complaint and Amended Complaint.

During these depositions, it also became clear that Sub Zero's corporate representative lacked any understanding of the contract or trade secret claims.  Mr. Hancock offered the following testimony regarding Sub Zero's contract claim:

- The NDA is a "noncompete," despite that there is no such provision in the NDA. Hancock Depo, p. 159.

- Defendants "[a]bsolutely" violated "their noncompete obligations under the agreement," and "that's why [Sub Zero] asserted this breach of contract claim." 30(b)(6) Depo, pp. 19-20.

- When asked, "So as the corporate representative of Sub Zero, when this lawsuit was filed, did you think that under this contract the defendants were prohibited from competing with Sub Zero?"  Mr. Hancock replied "Yes, and I still do."  *Id*. at 22-23.

- It was a "Huge…Huge" breach of the NDA to open a store.  *Id*. at 26.

- When asked for the location of the non-compete provision in the NDA: "I remember this document having actually much broader language . . ."  *Id*. at 22.

- Defendants' public front of the house color scheme and wall pattern allegedly constituted a breach of the NDA.  *Id*. at 23.

It was apparent Mr. Hancock, as Sub Zero's corporate representative, also had no concept of a trade secret. *See generally* 30(b)(6) deposition, pp. 38-60. He testified that the following were trade secrets: (1) all of the categories of information identified in Sub Zero's contentions, with particular emphasis on Sub Zero's liquid nitrogen suppliers and its purchase of liquid nitrogen from third parties (*see id.* at 43; *see generally* 43-60); (2) information regarding food costs (*id.* at 41); (3) "all the business experience and acumen that [Mr. Hancock] gathered over the years" (*id.* at 39); and (4) the layout of Sub Zero's stores (*id.* at 54-55). Mr. Hancock even testified that his public "patented process" for making ice cream is a trade secret. *Id.* at 42.

During the March 23, 2017 deposition, Kirton McConkie also finally produced the consolidated document containing all communications with Jason and Melissa Barth, which Mr. Hancock had referenced on March 22 as the evidence showing all of the information given to the Nyes by the Barths. As purportedly supporting Sub Zero's claims, these documents, like the alleged assignments, should have been produced months before.

These e-mail communications with the Barths from September 2014-February 2015 further demonstrated the lack of good faith basis for Sub Zero's trade secret and contract claims. Upon learning in September 2014 of the opening of the Arctic Scoop because of a news story, Hancock, other Sub Zero employees, and the Barths began communicating regarding a potential suit against Defendants. *See* Ex. 8. However, there was no discussion of any trade secret or confidential information that had been provided to the Nyes, or any facts that would support these claims. Instead, without input from counsel, Mr. Hancock determined that Sub Zero had claims for "1. Patent, 2. NDA and 3. Trade Dress." *See id.* at SZ 3802.[12] The only information

---

[12] It is not surprising that Mr. Hancock's franchisees agreed that he had a case for patent infringement, as Sub Zero's franchisees are led to believe that the '566 Patent covers any hand mixing of ice cream using liquid nitrogen, when the language of the claims of the '566 Patent is far more limited. *See* Deposition of Melissa Barth ("Melissa

provided by the Barths was a discussion of the appearance of the Arctic Scoop store and its employees that were viewed in a public news story.  *Id.* at 3800.

Instead of discussing any evidence to support these claims, these communications focused on the NDA's venue provision and the opportunity for a "test case" for Mr. Hancock's recently issued patent.  *Id.* at 3800; *see also* October 8, 2014 email (Ex. 23) at SZ 3811 ("The thing about this NDA is it sets the venue here in UT . . . . This is the perfect case to test the patent and use as the test case."); November 5, 2014 email (Ex. 24) at SZ 3857 ("We're going to need to drag them to UT but it's in the contract").  Another Sub Zero manager stated in correspondence that "we are excited to execute our patent for the first time and make an example."  September 24, 2014 email (Ex. 25) at SZ 3850.

During this time period, Sub Zero retained counsel (separate from Kirton McConkie) and sent a demand letter on October 28, 2014, accusing the Nyes of "Patent and Trade Dress Infringement and Breach of Non-Disclosure Agreement."  *See* Ex. 26; 30(b)(6) Depo, pp. 108-109.  In this letter, Sub Zero asserted that Defendants' "use of Sub Zero's patented process" constituted a breach of the NDA, despite that Defendants had never even been shown Sub Zero's process for making ice cream, and despite the obvious issue that a patent is a public document. *Id.*  The letter did not identify any confidential information provided to the Nyes.  *Id.* Defendants responded that liquid nitrogen had been used to create ice cream for over 100 years, and informed Sub Zero and Mr. Hancock that the Arctic Scoop employed the traditional, hand-crafted method which is "non-patentable, as [Mr. Hancock] discovered when his original patent

_____

Depo"), relevant pages of which are attached hereto as Ex. 21, p. 17 (testifying that her understanding was that the patent covered any hand mixing of ice cream using liquid nitrogen); *see also* Deposition of Jason Barth ("Jason Depo"), relevant pages of which are attached hereto as Ex. 22, p. 19 (the patent covers the Sub Zero process of manually making the ice cream).  Mr. Hancock even spoke to Ms. Barth on the phone the night before her deposition to tell her that even though he had been forced to disavow and remove claim terms such as "folding" during prosecution of the '566 Patent, the '566 Patent still covered "folding" the ice cream.  Melissa Depo, pp. 71-72.

application was twice rejected."  *See* November 4, 2014 correspondence (Ex. 27) at SZ 3927.

Further, that "[t]here was no confidential information given to [the Nyes] . . . . [and that they

learned] the business from another source."  *Id*.  Mr. Hancock then requested mediation pursuant

to the NDA, which occurred in Utah on February 3, 2015 and was unsuccessful.

Prior to this mediation, Mr. Hancock requested and received from the Barths all evidence

of their communications with the Nyes.  *See* February 3, 2015 emails from Melissa Barth to Jerry

Hancock, forwarding communications with the Nyes from 2013 (Ex. 28).  These

communications between the Barths and the Nyes from 2013 do not reflect any confidential,

proprietary, or trade secret information given to the Nyes.  *Id*.  Even the purported "trade secret"

of Sub Zero's purchase of liquid nitrogen from third party suppliers, upon which Mr. Hancock

placed great emphasis during his deposition, was nonexistent.  The correspondence showed that

Defendants were told by the Barths in 2013 that they could not use Sub Zero's supplier, and

would need to find their own source for liquid nitrogen.  *Id*. at SZ 3816.  Nothing in these

documents, and nothing in the two days of deposition testimony offered by Mr. Hancock,

presented any evidence to support the contract or trade secret claim, despite that such

information was allegedly already in Sub Zero's possession on the date of the Complaint.

**E.    The Depositions of the Barths Confirm the Lack of Good Faith Basis for Sub Zero's
        Trade Secret and Contract Claims**

The belatedly produced assignment documents revealed Sub Zero's lack of standing to

pursue either claim for patent infringement.  Accordingly, Defendants moved to dismiss these

claims on March 29, 2017.[13]  *See* DN 36.  Given the Barths' supposed crucial importance to Sub

---

[13] Prior to filing this motion, Defendants provided notice that it appeared that Kirton McConkie had further violated
Rule 11 with respect to the allegations of assignment, and requested Sub Zero's consent to dismissal of these claims.
*See* March 28, 2017 letter (Ex. 29).  Kirton McConkie responded that Sub Zero would oppose the motion.

Zero's remaining trade secret and contract claims, Defendants proceeded with their depositions on April 10, 2017.

Neither of the Barths could identify any trade secret or confidential information that they provided to the Nyes, much less knowledge of the use of such information by the Nyes. Ms. Barth, who ran the store and was the Nyes' point of contact, testified that the Nyes visited the Barths' franchise location in 2013 and were given a tour of the store. Melissa Depo, pp. 37-38, 42. Contrary to the testimony of Mr. Hancock, the Barths did not train the Nyes or demonstrate Sub Zero's process for making ice cream. *Id*. at 42. Ms. Barth confirmed that she informed the Nyes during this visit that they would need to find their own supplier of liquid nitrogen. *Id*. at 41. Outside of this limited information discussed during this visit, all other information provided to the Nyes by the Barths was done so via the emails belatedly produced by Sub Zero, which Ms. Barth originally forwarded in February 2015. *Id*. at 43, 47-52.

Mr. Barth testified that his only communication with the Nyes occurred during their visit. Jason Depo, p. 41. During this visit, Mr. Barth discussed general business advice with the Nyes and topics such as labor, cost of goods sold and suppliers, "how we operate and why we're successful," and that it is important to properly train your employees on making ice cream – nothing that even arguably constituted confidential or proprietary information. *See id*. at 40-46.

The Barths also had no knowledge of any proprietary or confidential information actually used by the Nyes in the operation of the Arctic Scoop. Contrary to Mr. Hancock's testimony and Sub Zero's statements in discovery, the Barths never visited the Arctic Scoop. *See* Melissa Depo, pp. 42-45; Jason Depo, pp. 35-37. Their only source of knowledge of the Arctic Scoop was a news story and online videos posted around the time the store was opened. *Id*. From these sources, the Barths viewed the public portions of the Arctic Scoop store on video, and saw that

the Arctic Scoop made ice cream by hand using liquid nitrogen, had nitrogen smoke on their cups, offered ice cream bases similar to Sub Zero, and had employees wearing hats and aprons with "the same look."  Melissa Depo, pp. 43-44.

These depositions also confirmed Kirton McConkie's failure to conduct a pre-suit investigation related to these claims.  Included in Sub Zero's March 23, 2017 production was an October 12, 2016 email from Jerry Hancock to the Barths, copied to Kirton McConkie, requesting that the Barths "write a response of Trade Secrets given to the NYE."  *See* October 12, 2016 email (Ex. 30), at SZ 3902.  This email – nearly a year after the Complaint was filed – detailed 11 categories of "the information we're looking for" to support the "NDA (Trade Secrets)" claim.  *Id.* [14]  It also contained the text of the prior emails forwarded by Ms. Barth in 2015, but requested actual copies of the emails.  After receiving this October 12, 2016 email, Ms. Barth spoke with Mr. Hancock and Mr. Stevens, and relayed the same information regarding the Nyes' visit to her franchise location as was detailed in her deposition.  Melissa Depo, pp. 54-57. She also forwarded the same e-mail correspondence with the Nyes from 2013 that she had previously forwarded in 2015.  *See* pp. 58-59; *see also* October 13, 2016 emails from Melissa Barth (Ex. 31).

Kirton McConkie made no effort to contact or interview these purportedly key witnesses as part of any pre-suit investigation.  Both Jason and Melissa Barth testified that this October 2016 exchange was the only instance that either one of them communicated with Kirton McConkie.  *See* Melissa Depo, p. 52; Jason Depo, pp. 14, 71.  Ms. Barth did not communicate with anyone from Sub Zero regarding this dispute after forwarding emails prior to the February 2015 mediation, until she was contacted in October 2016.  Melissa Depo, pp. 51-54; pp. 58-60.

---

[14] Categories of information sought by Kirton McConkie such as "pictures," "food costs," or "anything related to the Patent such as size of bowl," would not even constitute trade secrets.

Both Mr. and Ms. Barth testified that, outside of the produced emails from 2014 and 2015, they did not communicate with anyone from Sub Zero, including attorneys, regarding the Nyes prior to the lawsuit.  Melissa Depo, pp. 53-54; Jason Depo, pp. 59-62.  They were also never previously asked for the specific information requested in the October 2016 email, and never communicated with Mr. Hancock or his attorneys regarding trade secrets.  Melissa Depo, pp. 56-59; Jason Depo, pp. 69-70.

The Barths' testimony further belied the description of the purported pre-suit investigation offered by Sub Zero in discovery responses and in depositions.  *See* Ex. 20, Answer to Interrogatory No. 7.  In an Interrogatory Answer verified by Mr. Hancock, Sub Zero asserted that its "pre-suit investigation was not limited to review of videos," but included visits by "Melissa and/or Jason Barth," for the purpose of observing "the preparation of ice cream."  *Id.* At his deposition, Mr. Hancock was certain that either Jason or Melissa Barth had visited the store soon after opening.  He detailed how he instructed one of the Barths to visit the store to "get as much information as you can," (Hancock Depo, p. 103), and "sent them a link to the ['566 patent" (*id.* at 106), and that the Barths reported back to him regarding their visit.  *See generally id.* at 103-108.

None of this was true.  Neither one of the Barths ever visited the Arctic Scoop.  Melissa Depo, p. 27; Jason Depo, p. 33.  Neither of the Barths ever reviewed the '566 Patent or communicated with anyone from Sub Zero regarding this patent, until Mr. Hancock and Ms. Barth spoke before her deposition.  Melissa Depo, pp. 16-18, pp. 66-73; Jason Depo, pp. 17, 27-28.  Instead, their only "role" in any investigation or knowledge of the Arctic Scoop was the news story and online video they viewed in 2014 when the store opened.  Melissa Depo, pp. 34-35.

Sub Zero also asserted in its Interrogatory Answer that at least eleven publicly available videos of the Arctic Scoop's store and process were reviewed as part of this pre-suit investigation, which Mr. Hancock confirmed under oath.  Ex. 20, Answer to Interrogatory No. 7; Hancock Depo, p. 120.  As can be seen by accessing the websites for the eleven identified videos, only three of these videos were even created and published prior to the filing of the Complaint.  *See* Ex. 20, Answer to Interrogatory No. 7.  Mr. Hancock also testified that the only documents related to any pre suit investigation were the email communications with the Barths – which show no evidence to support these claims.  Hancock Depo, p. 125; *see also* 30(b)(6) Depo, pp. 121-122 (confirming all testimony regarding the pre-suit investigation as corporate representative).

## F.    Recent Procedural History

As the Court is aware, Sub Zero filed an opposition to Defendants' Motion to Dismiss (DN 36) on April 26, 2017, along with an untimely motion for leave to amend its complaint to add Sub Nitro as a party.  In briefing on these issues, Sub Zero acknowledged the invalidity of the purported March 2016 assignment of the Patents at Issue to Sub Zero, and claimed that Kirton McConkie was "mistaken" when it asserted in the Amended Complaint that Sub Zero was the assignee of the Patents at Issue.  *See* DN 44.  It offered no explanation or excuse for the false statements of ownership of the '566 Patent contained in the original Complaint.

Instead of acknowledging its lack of standing, Sub Zero responded with an argument and declaration from Mr. Hancock that Sub Zero had always been the "exclusive licensee" of the '566 Patent by way an "oral, implied license" from Mr. Hancock that had existed continuously since prior to the original Complaint.  *See* DN 39, p. 2.  Further, that "[t]he '566 patent has never been licensed to anyone but Sub Zero and Sub Zero has always had the exclusive control and

effective ownership over all rights of the '566 Patent . . . and Sub Zero acted as the owner . . . by sub-licensing its franchisees to operate under . . . the '566 Patent."  DN 39, p. 5.

This new narrative[15] was contradicted by: (1) the lack of any sub-license of, or reference to, the '566 Patent in any Sub Zero franchise agreement; (2) the lack of any reference to any "exclusive license" in the Complaint or Amended Complaint; (3) the demand letters sent by Kirton McConkie in May – July 2016 on behalf of Sub Nitro offering to license the Patents at Issue from Sub Nitro to third parties; (4) all of the purported assignment documents from March 2016, which made no reference to any exclusive license and in which Mr. Hancock personally attempted to assign rights in the '566 Patent to Sub Nitro; and (5) Sub Zero's entire prior course of conduct in these proceedings.  Not only did Sub Zero fail to demonstrate any exclusive license, such an argument was legally irrelevant.  As a matter of law, an oral exclusive licensee could only have standing to sue if it was joined by a party with title to the patent on the date of the Complaint, which was not Sub Nitro.

The Court granted Defendants' Motion to Dismiss and denied Sub Zero's motion for leave to amend on May 22, 2017 following a hearing.  *See* Order, DN 46.  Defendants sought to move the remaining claims in the case forward and sent a draft scheduling order to Kirton McConkie on June 19, 2017.  *See* June-July 2017 email chain (Ex. 32).  Kirton McConkie responded that Sub Zero would agree to the scheduling order, but requested that Defendants produce alleged outstanding discovery from Defendants' November 2016 discovery responses. *Id*.  Regardless of the untimeliness of this request, Defendants produced such documents on June

---

[15] Sub Zero stated that it only realized the ineffectiveness of the March 2016 assignments after receiving Defendants' motion to dismiss, further indicating that it came up with this exclusive licensee narrative in preparing its response to the motion. DN 44, p. 6. Moreover, when Kirton McConkie informed Defendants on March 29, 2017 that Sub Zero would oppose the motion to dismiss, Kirton McConkie said nothing of this purported exclusive license.

29, 2017, and again requested consent to the scheduling order.  *Id*.  Defendants also reiterated their request for a long-outstanding privilege log.  *Id*.  Over the next week, Sub Zero continued to refuse to consent to entry of a scheduling order on the basis of additional purportedly outstanding discovery, claiming that documents which related only to the now-dismissed patent claims should be produced, and further refused to produce a privilege log on baseless grounds.  *See* Ex. 32; *see also* June 30, 2017 correspondence (Ex. 33).  On July 12, 2017, Defendants once again affirmed that all outstanding discovery had been produced, renewed their request for a privilege log, and informed Sub Zero this was their final request for Sub Zero's consent to a scheduling order.  *See* July 12, 2017 correspondence (Ex. 34).

On July 17, 2017, Kirton McConkie responded that it had been authorized to dismiss the remaining claims in this case.  *See* July 17, 2017 email with attached draft stipulation (Ex. 35).  It further provided a proposed draft Stipulation of Dismissal, stating that the Court had dismissed the pending patent claims, "and **Plaintiff having failed to discover evidence to support its other claims**," the parties agree to their dismissal with prejudice.  *Id*. (emphasis added).

## ARGUMENT

I.   **Kirton McConkie Committed Numerous Rule 11 Violations in Signing and Filing the Complaint and Amended Complaint**.

> By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>     (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>     (2) the claims . . . and other legal contentions are warranted by existing law . . . : [and]
>     (3) the factual contentions have evidentiary support, or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery….

Fed. R. Civ. P. 11(b).  In the event the Court finds a violation of Rule 11(b), it is authorized to impose sanctions upon Kirton McConkie.  Fed. R. Civ. P. 11(c); *see also Adamson v. Bowen*, 855 F.2d 668, 672 (10th Cir. 1988) ("Rule 11 requires sanctions against attorneys who file signed pleadings, motions or other papers in district court which are not well grounded in fact, are not warranted by existing law or a good faith argument for its extension, or are filed for an improper purpose.").  The award of sanctions involves two steps, a court must first find that a submission violates Rule 11, then determine an appropriate sanction.  *Adamson*, 855 F.2d at 672.

In determining whether a Rule 11 violation has occurred, the 10th Circuit applies an objective standard.  *See White v. General Motors Corp., Inc.*, 908 F.2d 675, 680 (10th Cir. 1990). "[A]n attorney's actions must be objectively reasonable in order to avoid Rule 11 sanctions.  A good faith belief in the merit of an argument is not sufficient; the attorney's belief must also be in accord with what a reasonable, competent attorney would believe under the circumstances." *Id*. (internal citations omitted).  "In addition, it is not sufficient for an offending attorney to allege that a competent attorney *could* have made a colorable claim based on the facts and law at

1

issue; the offending attorney must actually present a colorable claim." *Id*. (internal citations omitted) (emphasis added).

Prior to filing, Rule 11 also imposes a requirement that the attorney conduct a "reasonable investigation" into the legal and factual basis for the contentions and claims raised in the pleading. *See* Rule 11(b); *see also Adamson*, 855 F.2d at 673 (if "after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law then such conduct is sanctionable… The attorney must 'stop, look and listen' before signing a document subject to Rule 11") (internal citations omitted); *White*, 908 F.2d at 681 ("Failing to investigate the facts of a claim before filing a complaint is sanctionable….") (internal citations omitted). This is particularly true with respect to patent claims, as "[a] patent suit can be an expensive proposition. Defending against baseless claims of infringement subjects the alleged infringer to undue costs – precisely the scenario Rule 11 contemplates." *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986 (Fed. Cir. 2000).

An objective standard is also applied to determine the reasonableness of the investigation, taking into consideration such factors as the time the attorney has for inquiry, the complexity of the factual issues, and the need for discovery to develop the facts supporting the claim. *Cook v. Rockwell Intern. Corp.*, 147 F.R.D. 237, 246 (D. Colo. 1993) (citing *Business Guides, Inc. v. Chromatic Communications Enter., Inc.*, 498 U.S. 533, 551 (1991)) (other internal citations omitted). "[T]he investigation, at a minimum, 'must uncover some information to support the allegations in the complaint.'" *Bains Ultra Inc. v. 7677 East Berry Ave. Associates, LP*, No. 08-cv-02021, 2009 WL 347476, at *2 (D. Colo. Feb. 10, 2009) (citing *Brubaker v. City of Richmond*, 943 F.2d 1363, 1373 (4th Cir. 1991)).

Kirton McConkie committed multiple Rule 11 violations when it signed the Complaint and Amended Complaint, in part because of an apparent wholesale failure to conduct any reasonable pre-suit investigation.

### 1.      Statements Regarding Ownership of the '566 Patent in the Complaint

The false statement in the original Complaint that "Sub Zero is the owner of the right to enforce the '566 Patent against the Defendants by assignment," constitutes an obvious violation of Rule 11(b)(3).  *See Clark v. The Walt Disney Co.*, 748 F. Supp. 2d 792, 801-02 (S.D. Ohio 2010) (counsel violated Rule 11 by including false statements in complaint and amended complaints regarding ownership of the patent);[16] *Schrag v. Dinges*, 73 F.3d 374 (unpublished), 1995 WL 675475, at * 13 (10th Cir. Nov. 14, 1995) (allegations in complaint alleging plaintiffs' ownership of rights that belonged to a company instead of individual plaintiffs violated Rule 11); *Carl Zeiss Vision Int'l GMBH v. Signet Armorlite, Inc.*, 2009 WL 10668689, No. 07-cv-0894, at *3-4 (S.D. Cal. Mar. 17, 2009) (sanctions are appropriate if "the party asserting the claim is not the owner of the patent in suit").

Kirton McConkie has not even contested that such statement was false – nor could it, given that the evidence shows that four months after the Complaint was filed, Hancock still owned the patent individually and attempted to assign the '566 Patent to Sub Nitro, which then purportedly assigned the right to sue Defendants to Sub Zero.  Moreover, when facing dismissal of its patent infringement claims for lack of standing (DN 36), Kirton McConkie did not even attempt to justify this statement or offer any explanation for this error.  In briefing on this motion, Kirton McConkie attempted to take ownership over and excuse its "mistake" in the

---

[16] Unlike *Clark*, where the plaintiff was forthright in discovery that the plaintiff was only a co-owner of the patent, leading defendants to file a motion to dismiss much earlier in the proceedings, here Kirton McConkie concealed this Rule 11 violation until March 2017.

Amended Complaint when it alleged that Sub Zero was the assignee of the '566 Patent (a mistake purportedly based on the ineffective March 2016 assignments).  However, it remained totally silent and attempted to gloss over the false statement in the November 2015 Complaint.

No later than March 2016, Kirton McConkie was fully aware that the allegations from the original Complaint were false and that Sub Zero lacked standing to pursue this claim.  At best, Kirton McConkie undertook no pre-filing investigation whatsoever into the ownership of the '566 Patent, discovered this error, and concealed it.  At worst, it knew at the time of the Complaint that this allegation was false.  Either way, Kirton McConkie violated Rule 11(b)(3) because there was there was no evidentiary support for this factual allegation based on a reasonable pre-filing investigation.

## 2. Statements Regarding Ownership of Both Patents at Issue in the Amended Complaint

Kirton McConkie certified statements in the Amended Complaint that Sub Zero was the owner of the right to enforce the '566 and '868 Patent against Defendants.  As already acknowledged, Sub Zero had no right to enforce either of the Patents at Issue at the time of the Amended Complaint, rendering these allegations either without evidentiary support or not warranted by existing law, in violation of Rule 11(b)(2) or Rule 11(b)(3).  Kirton McConkie will likely respond as they did previously that these allegations were made in good faith because Kirton McConkie "misunderstood" the legal effectiveness of the purported March 2016 assignment from Sub Nitro to Sub Zero (*See* May 17, 2017 Reply, DN 44, pp. 5-6):

> [S]uch attempted assignment was legally ineffective, and Sub Zero does not now contend otherwise . . . .  The delay [in seeking to add Sub Nitro] was not undue but was instead due to a misunderstanding of the effectiveness of the attempted March 15, 2016 assignment of the right to enforce the '566 Patent and the '868 Patent against Defendants.  Sub Zero only learned that the March 15, 2016 assignment was ineffective to grant it sufficient rights to pursue this litigation . . . at the time that Defendants filed their motion to dismiss . . . .  Sub Zero accordingly acknowledges that when it stated, in paragraphs 21 and 26 of the

Amended Complaint, that it owned the right to enforce the '566 patent and the '868 Patent against Defendants by assignment (e.g., on its own behalf without joinder of Sub Nitro), that such statements were mistaken.

*See* DN 44, pp. 5-6.

Kirton McConkie's purported subjective good faith and ownership of this "mistake" does not save it from a Rule 11 violation, given that the standard is objective.  *See White*, 908 F.2d at 680 ("A good faith belief in the merit of an argument is not sufficient…").  Moreover, this is particularly true where Kirton McConkie only took ownership of this "mistake" in a meaningless gesture after improperly concealing the assignment documents for nearly a year and only after Defendants had already demonstrated to the Court that these assignments were "ineffective."  If Kirton McConkie truly previously believed these assignments were effective and gave Sub Zero standing, it is inexplicable that it withheld these documents from Defendants until March 2017, when it had no choice but to produce them.

Moreover, Kirton McConkie's admission that it "only learned" of the legal ineffectiveness of these assignments "at the time that Defendants filed their motion to dismiss," is an admission that Kirton McConkie never researched or looked into the legal effectiveness of these assignments (which they drafted) prior to filing the Amended Complaint.  As presented in Defendants' motion, it is straightforward, black-letter law that an assignment of the right to sue only three parties is not legally effective and does not confer standing – otherwise patentees would be free to hand out "rights" to various third parties allowing numerous plaintiffs to maintain separate lawsuits against separate purported infringers.  A reasonably competent attorney, after any investigation into the applicable law regarding the type of assignment necessary to confer standing (a total assignment of all rights under the patent), would not have

believed that the March 2016 assignments to Sub Zero were effective, and would not have certified the allegations in the Amended Complaint regarding ownership by assignment.

### 3.   Allegations of Breach of Contract and Misappropriation of Trade Secrets in the Complaint and Amended Complaint

Kirton McConkie lacked any factual or legal basis to assert a claim for breach of the NDA or for misappropriation of trade secrets when it certified the Complaint and Amended Complaint, in violation of Rule 11(b)(3) and/or Rule 11(b)(2).  *See White*, 908 F.2d at 681 (finding Rule 11 violation where plaintiffs, when they filed their complaint, evidenced neither general knowledge of the elements of a cause of action nor knowledge of the specifics to support their claims); *see Homecare CRM, LLC v. Adam Group, Inc. of Mid. Tenn.*, 952 F. Supp. 2d 1373, 1380-84 (N.D. Ga. 2013) (finding violation of Rule 11(b)(3) where there was no evidentiary basis at the time of the complaint for an allegation that trade secrets had been misappropriated).  The following factual allegations did not have evidentiary support pursuant to Rule 11(b)(3): (1) that Sub Zero disclosed confidential and trade secret information directly to Defendants (*see* DN 2, ¶ 16); (2) that franchisees of Sub Zero disclosed confidential and trade secret information to Defendants (*id*. at ¶ 16); (3) that Defendants breached the NDA by using such confidential information in the operation of the Arctic Scoop (*id*. at ¶ 30); or (4) that Defendants misappropriated trade secrets disclosed to them by using them in the operation of the Arctic Scoop (*id*. at ¶¶ 36-38).

There was no evidence to support any of the allegations (*id*. at ¶¶ 15-19, 27-44) related to these claims.  Mr. Hancock testified that Sub Zero itself never provided any trade secrets or confidential information to the Nyes.  Further, that Sub Zero had no knowledge of any confidential information or trade secrets given to the Nyes, including by the Barths.  Instead, the only evidence to support these claims were the belatedly produced e-mail communications.  This

6

correspondence with the Barths further demonstrated that no confidential information or trade secrets were exchanged, and that Sub Zero was fully aware of this fact.

After Mr. Hancock essentially placed responsibility for these claims on the knowledge of the Barths, the Barths testified that they had not provided any confidential or trade secret information to the Nyes.  In addition, Sub Zero had no evidence that the Nyes had actually used any confidential information or trade secrets in the operation of the Arctic Scoop.  The Barths similarly had no knowledge of the Nyes' business or the use of any purported confidential information, as they only reviewed online videos of publicly available portions of the Arctic Scoop.  Contrary to the allegations in the Complaint and Amended Complaint, Sub Zero had no knowledge or evidence of any trade secrets or confidential information given to Defendants, much less misappropriated or used by Defendants.

Kirton McConkie has now acknowledged it never had any evidence to support these allegations or claims, as it admitted in the July 17, 2017 proposed Stipulation of Dismissal that it "failed to discover" such evidence.  *See* Ex. 35.   However, rather than failing "to discover" evidence during this case, this lack of evidence was available to Kirton McConkie and Sub Zero prior to filing the Complaint.  This is not a case where counsel had a legitimate evidentiary basis for a claim, but needed discovery in litigation from the opposition or a third party to determine whether such a claim truly existed and could move to trial.  Under Sub Zero's own allegations and theory of the case, Sub Zero itself was the source of the facts to support these claims, as Sub Zero and its franchisees allegedly provided confidential information and trade secrets directly to the Nyes, and were further aware of the Nyes' use of such information.  *See Homecare*, 952 F. Supp. 2d at 1380, 84 (finding sanctions particularly appropriate because evidence demonstrating the frivolousness of a trade secret claim was already in the plaintiff's possession at the time of

the complaint).  All of the evidence (or lack thereof) was in Kirton McConkie or Sub Zero's hands prior to filing of the lawsuit.  Further, Kirton McConkie did not plead any of these "facts" upon information and belief, or specifically identify that such allegations "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery" pursuant to Rule 11(b)(3).  Instead, it simply pled facts with no evidentiary support, in violation of this rule.

It further appears Kirton McConkie failed to conduct any pre-suit investigation with respect to these claims.  The only time Kirton McConkie ever contacted the Barths – the purported key source of evidence for these claims – to investigate these claims was on October 12, 2016, nearly one year after the Complaint was filed, and likely in preparation for Sub Zero's October 31, 2016 deadline for its trade secret contentions.  *See* Ex. 30, *supra*.  The Barths testified that they never discussed trade secrets with Sub Zero or any attorneys and did not communicate with anyone from Sub Zero on these issues outside of what is reflected in the correspondence from 2014 and 2015.  These documents – which Mr. Hancock testified were the only documents related to any pre-suit investigation of the Arctic Scoop – were already in Sub Zero's possession no later than February 2015, long before the lawsuit was filed, and in no way provide a factual basis for these claims.

Kirton McConkie, apparently retained sometime after the February 2015 mediation, had ample time to investigate these facts and appears to have chosen not to.[17]  Counsel either did not bother to review the facts and law or simply allowed its client, who had no concept of the legal

---

[17] Rob Kennedy produced documents pursuant to a subpoena showing that Kirton McConkie had sent a draft complaint to Mr. Hancock approximately 45 days before filing the Complaint, a draft that was not changed materially prior to filing.  *See* Ex. 36 (RK 14-27).  Sub Zero waited over a year after sending Defendants a cease and desist letter, and over eight months following the mediation, to file suit.  Kirton McConkie had more than ample time and the necessary information to conduct a sufficient pre-suit investigation.

or factual requirements for these claims (*see* Section D, *supra*), to dictate what was filed.  While Mr. Hancock may have believed Sub Zero could assert these claims based on complete misconceptions of the law (*see* pp. xviii) and the language of the contract (*see* pp. xvii), this does not absolve Kirton McConkie of its obligations under Rule 11.  Alternatively, given that the correspondence related to these claims was in Sub Zero's and Kirton McConkie's possession and withheld, it is possible Kirton McConkie was fully aware of the lack of any basis for the allegations in the Complaint, and filed and pursued them anyway.

Even Sub Zero's statements in discovery regarding the purported pre-suit investigation were false.  *See* Section E, *supra*.  Neither of the Barths ever visited the Arctic Scoop, and the majority of the purported online videos (which would not have provided information to support a trade secret or breach of contract claim) which were supposedly reviewed were not even in existence as of the date of the Complaint.

It also appears these claims were brought for an improper purpose – as a pretext to force Defendants into litigation in Utah due to the venue selection provision in the NDA – in violation of Rule 11(b)(1).  This was clearly a point of focus for Mr. Hancock in pre-suit correspondence in 2014, where he identified this venue provision as providing a perfect opportunity for his patent "test case."  *See* Exs. 23-25.  Sub Zero did not attempt to take significant discovery related to these claims and did not even seek to take the Nyes' depositions.  With the patent claims dismissed, it is telling that Sub Zero is now willing to dismiss the remaining claims (which allowed Sub Zero to bring this case in Utah), despite that the "evidence" available to Sub Zero at this juncture is the same evidence that has been available to it since before it filed the lawsuit.

## II.     Kirton McConkie's Post-Complaint Conduct Violated 28 U.S.C. § 1927.

Kirton McConkie's conduct throughout these proceedings violated its ongoing

obligations under Rule 11,[18] as well as 28 U.S.C. § 1927, which authorizes the imposition of

sanctions for post-complaint conduct which unnecessarily prolongs or multiplies proceedings.

This statute provides that: "[a]ny attorney . . . who so multiplies the proceedings in any case

unreasonably and vexatiously may be required by the court to satisfy personally the excess costs,

expenses, and attorneys' fees reasonably incurred because of such conduct." *Id.*  "Sanctions

under § 1927 are appropriate when an attorney acts recklessly or with indifference to the law.

They may also be awarded when an attorney is cavalier or bent on misleading the court;

intentionally acts without a plausible basis; or when the entire course of the proceedings was

unwarranted." *Dominion Video Satellite, Inc. v. Echostar Satellite L.L.C.*, 430 F.3d 1269, 1278

(10th Cir. 2005) (internal citations and quotations omitted).

An objective standard is to be applied under § 1927 and does not require a showing of

bad faith. *Hamilton v. Boise Cascade Exp.*, 519 F.3d 1197, 1202 (10th Cir. 2008).  Thus, under

this statute, "excess costs, expenses, or attorney's fees are imposable against an attorney

personally for conduct that, viewed objectively, manifests either intentional or reckless disregard

of the attorney's duties to the court." *Braley v. Campbell*, 832 F.2d 1504, 1512 (10th Cir. 1987).

These duties include an obligation to "regularly re-evaluate the merits of [the attorney's] claims .

. . [and] avoid prolonging meritless claims." *Steinert v. Winn Grp., Inc.*, 440 F.3d 1214, 1224

(10th Cir. 2006) (internal citations omitted).

---

[18] Rule 11 imposes continuing obligations. *See* 1993 Advisory Committee Notes ("a litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have merit").

The purpose of sanctions under 28 U.S.C. § 1927 is to "compensate victims of abusive litigation practices," under a "victim-centered approach," and sanctions "are levied to compensate the victims of dilatory practices." *Hamilton*, 519 F.3d at 1203, 1205.  Courts have awarded sanctions under this statute, including attorneys' fees, for the continued pursuit of meritless claims and other vexatious conduct which unnecessarily prolongs proceedings. *Hamilton*, 519 F.3d at 1200-1205 (filing and pursuing motion to enforce settlement agreement in contravention of actual terms of settlement agreement and notices from defendant's counsel violated § 1927); *Braley*, 832 F.2d at 1512-1513 (pursuit of meritless appeal violated § 1927); *Dreiling v. Peugeot Motors of Am., Inc.*, 768 F.2d 1159, 1162-63, 1165-66 (10th Cir. 1985) (upholding award of attorneys' fees and costs as sanctions where counsel had no factual or legal basis for filing claim against defendant and pursued the claim for a year and seven months "long after it would have been reasonable and responsible to dismiss the claims," before moving to voluntarily dismiss the claim); *Thommen Medical USA, LLC v. Tanner*, No. 11-cv-03010, 2014 WL 4494815, at * 2-4 (D. Colo. Sep. 12, 2014) (awarding sanctions under § 1927 for all fees incurred as a result of counsel's continued pursuit of meritless claims for damages and injunctive relief after date that counsel knew or should have known of the lack of basis for claims).

The history of this case is one of constant and repeated violations of this statute.  Not only did Kirton McConkie unreasonably multiply these proceedings through its pursuit of meritless claims for nearly two years, it further withheld information that should have been disclosed which would have put Defendants on notice of these issues.  Such conduct further improperly prolonged these proceedings and forced Defendants to incur wholly unwarranted costs, including substantial costs in discovery.  *See Thommen*, 2014 WL 4494815, at *3 (counsel vexatiously multiplied the proceedings pursuing meritless claims because "defense counsel

11

reasonably was required to prepare for depositions, complete other discovery, prepare a motion for summary judgment, respond to certain filings, and research the issue of sanctions").

Principal among these violations was Kirton McConkie's continued pursuit of claims for infringement of the '566 Patent and '868 Patent. Even affording the benefit of the doubt, no later than March 2016, Kirton McConkie was aware that the allegations in the Complaint regarding the assignment of the '566 Patent were false, and that Sub Zero lacked standing to assert this claim, a defect which rendered this claim subject to immediate dismissal. It did not bring this to the attention of the Court or Defendants. Instead, it continued to pursue this claim with knowledge of the lack of standing, adding another claim for patent infringement in the Amended Complaint, for which Sub Zero also did not have standing. This required Defendants to diligently investigate and prepare a defense against these claims on the merits, including filing multiple answers and counterclaims, and preparing invalidity and non-infringement positions and contentions.

Even more serious, Kirton McConkie compounded its violations of § 1927 by repeatedly withholding documents and information – subject to mandatory disclosure – that would have put Defendants on notice of Sub Zero's lack of standing. The purported March 2016 assignments were subject to production in September 2016 pursuant to LPR 2.2(a). Kirton McConkie ignored no less than six requests by Defendants in November 2016 – January 2017 for production of documents responsive to these categories, and allowed Defendants to believe that all such documents had been produced.

During this time period, Kirton McConkie made four separate productions of documents purportedly responsive to the categories of documents identified in LPR 2.2(a), on December 8, 2016, January 27, 2017, February 6, 2017 and February 15, 2017. Thus, on four separate

occasions, Kirton McConkie was in possession of these undoubtedly responsive documents, and while it produced other documents purportedly responsive to categories identified in LPR 2.2(a), it deliberately withheld these documents.  These documents – which would have allowed Defendants to move to dismiss long before depositions were taken – were also responsive to the Arctic Scoop's discovery requests, and were again withheld from the document production on March 17, 2017.  Only on March 23, 2017, when Kirton McConkie had no other choice because Mr. Hancock had testified that Sub Zero was not the assignee of one of the patents, did Kirton McConkie produce these documents.

Even after Defendants received these documents and moved to dismiss, Kirton McConkie further multiplied these proceedings by opposing the motion and filing an additional, untimely motion for leave to amend to add Sub Nitro as a party.  It based these filings on a new argument that Sub Zero was a purported oral, implied, exclusive licensee of the '566 Patent as of the date of the Complaint.  Even if Sub Zero was an exclusive licensee as of November 19, 2015, Kirton McConkie's argument in support of standing was legally baseless because the party it sought to add to cure this defect, Sub Nitro, had no rights in the '566 Patent as of the date of the Complaint.  *See Steinert v. Winn Group, Inc.*, 440 F.3d at 1225 (imposing § 1927 sanctions for pursuit of claims and arguments in response to a motion to dismiss that were contrary to well-established law, including moving to amend/add parties); *Schrag v. Dinges*, 1995 WL 675475, at *10 (upholding sanctions for opposing motion to dismiss for lack of jurisdiction based on position that was contrary to controlling precedent").

Moreover, this "exclusive license" was first introduced in April 2017 and conveniently only required a purported oral agreement between Mr. Hancock and himself, as the owner and only officer of Sub Zero.  It is belied by (1) Sub Zero's franchise agreements, which do not even

reference the '566 Patent or any sub-license; (2) the allegations of the Complaint and Amended

Complaint, which do not mention any exclusive license; (3) Mr. Hancock's purported March

2016 assignment of all right, title and interest in the '566 Patent for purposes of enforcement to

Sub Nitro, which does not include any reference to Sub Zero as exclusive licensee; (4) the

purported limited assignment from Sub Nitro to Sub Zero, which does not include any reference

to any exclusive license already granted to Sub Zero; and (5) cease and desist letters from May –

July 2016 asserting that Sub Nitro was the owner of the '566 Patent and offering to license the

'566 Patent from Sub Nitro to third parties.  When Defendants sent correspondence to Kirton

McConkie on March 28, 2017 prior to filing the motion to dismiss, stating that the recently

disclosed assignments demonstrated a lack of standing, Kirton McConkie did not respond with

any mention of any "exclusive license," only that Sub Zero would oppose the motion.  Kirton

McConkie admits that it reevaluated its legal position in response to Defendants' motion (DN 44,

p. 6), and appears to have manufactured this narrative at that time while researching its response.

The entire history of Kirton McConkie's conduct with respect to these patent infringement

claims, and every step it took in pursuit of these claims, constitute violations of § 1927.

Similar violations occurred with respect to Kirton McConkie's pursuit of the contract and

trade secret claims.  Kirton McConkie admits that it was never in possession of evidence to

support these claims, but pursued them for approximately 1.5 years.  Such conduct is the

definition of vexatious and constitutes an ongoing violation of both 28 U.S.C. § 1927 and Rule

11.

While these claims should never have been asserted, they should certainly have been

dismissed prior to July 2017.  When Kirton McConkie finally contacted the Barths in October

2016 to investigate these claims, and confirmed that there was no factual basis for these claims

14

(based on information already in Sub Zero's possession), it should have dismissed them at that time.

Kirton McConkie further ignored the Court's order to identify trade secrets with particularity in Sub Zero's October 31, 2016, and continued to pursue these claims. An obvious example of Kirton McConkie's continuing misconduct is that only three weeks prior to serving these contentions, Kirton McConkie was a party to email correspondence re-exchanging the prior emails sent to Sub Zero by Melissa Barth. These documents conclusively showed that the Nyes had not received any confidential information from Sub Zero or its franchisees regarding Sub Zero's process for obtaining or purchasing liquid nitrogen, and had certainly not misappropriated such information. Instead, the Barths informed the Nyes they would need to find their own supply of liquid nitrogen. Yet, three weeks later, Kirton McConkie did not hesitate to serve trade secret contentions falsely asserting that Defendants had misappropriated Sub Zero's trade secrets regarding obtaining and purchasing liquid nitrogen supply, including (i) the identity of Sub Zero's nitrogen suppliers, (ii) how to overcome safety issues raised by such suppliers, (iii) Sub Zero's nitrogen pricing and pricing strategies, and (iv) information regarding difficulties with certain nitrogen suppliers. *See* Ex. 15, p. 2. Setting aside that such publicly available information related to third parties would not constitute trade secrets, Kirton McConkie identified such information despite knowing full well that Defendants had never received or misappropriated such information.

Even after receiving Defendants' formal notice pursuant to Rule 11 on November 18, 2016 and reviewing Defendants' discovery responses served on November 22, 2016, Kirton McConkie persisted in maintaining these claims. It responded to Defendants' Rule 11 letter two months later that it was "early in discovery," and that Sub Zero would consider dismissing its

15

trade secret cause of action at the end of discovery – apparently under the misconception that a party can assert claims without basis, force a defendant to incur substantial costs in their defense, and then simply walk away.  Neither Rule 11 nor 28 U.S.C. § 1927 allow such litigation abuses.

As with Sub Zero's patent claims, Kirton McConkie's misconduct further prevented and delayed Defendants from learning the lack of basis for these claims.  Kirton McConkie submitted Initial Disclosures identifying Mr. Hancock, Ms. Barth, and Mr. Barth as witnesses with knowledge of the confidential and trade secret information provided to the Nyes, and their alleged use and misappropriation of such information.  None of these witnesses were in possession of such information.  Kirton McConkie further withheld key discovery related to these claims, only producing the correspondence with the Barths on March 23, 2017 after Mr. Hancock identified these documents in his deposition.  These documents were in Sub Zero's possession long before the lawsuit and were responsive to the initial disclosure requirements of FRCP 26(a), as Mr. Hancock identified them as the principal evidence related to these claims. Yet, they were withheld – likely because they demonstrated the lack of evidence to support these claims – until Kirton McConkie had no choice but to turn them over.

Such misconduct further prolonged this case and required Defendants to move forward with discovery and unnecessary depositions, which confirmed that these claims never should have been asserted.  Only in July 2017 did Kirton McConkie finally acknowledge the lack of any evidence and inform Defendants it was ready to dismiss these claims.  Kirton McConkie never had a basis for these claims or its allegations, and asserted them anyway.  It then continued to pursue them with knowledge of the lack of evidence, and actively prevented Defendants from learning this truth in discovery.  The assertion and pursuit of these claims constitute violations of Rule 11 and 28 U.S.C. § 1927.

**III.     Defendants Are Entitled to Their Attorneys' Fees Incurred in this Case as Sanctions.**

The Court may award Defendants' attorneys' fees as sanctions pursuant to both 28 U.S.C. § 1927 and Rule 11(c)(4).  *See Hamilton*, 519 F.3d at 1205 ("Section 1927 . . . allows a court to require an attorney to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of vexatiously multiplicative conduct") (internal citations and quotations omitted).  The purpose of sanctions under Rule 11 is to deter repetition of the conduct by the offender or comparable conduct by others, while the purpose of § 1927 is to compensate victims for abusive litigation practices.  *See* FRCP 11(c)(4); *Hamilton*, 519 F.3d at 1205.

These goals of deterrence and compensation both weigh in favor of an award of Defendants' attorneys' fees.  Kirton McConkie's numerous and consistent violations of Rule 11 and § 1927 directly resulted in all of Defendants' fees incurred in this case.  Kirton McConkie committed Rule 11 violations with respect to each claim asserted in the Complaint and Amended Complaint.  None of these claims should ever have been asserted.  Accordingly, all of Defendants' fees and costs were incurred as a direct result of this misconduct.

Moreover, Kirton McConkie's pursuit of these claims in violation of 28 U.S.C. § 1927 and Rule 11 only served to unnecessarily increase Defendants' fees.  Not only did Kirton McConkie knowingly pursue patent claims subject to dismissal, it concealed its lack of standing and prior false statements regarding ownership from the Court, drastically increasing Defendants' already unwarranted burden and fees.  As a result of such conduct, Defendants were forced to defend against these claims until May 2017, despite that Sub Zero never had standing to assert and pursue such claims in the first place.  Defendants were further forced to incur significant additional fees in briefing the motion to dismiss and Sub Zero's second motion for

17

leave to amend, and attending a hearing on these motions, due to Sub Zero's assertion of a baseless and legally irrelevant position.

Kirton McConkie also concealed the lack of basis for its trade secret and contract claims by identifying multiple purported witnesses with supposed knowledge of relevant facts, when these witnesses had no such knowledge.  It asserted trade secret contentions it knew full well were baseless.  It actively withheld the key discovery related to these claims, forcing Defendants to serve additional discovery and take depositions to learn the lack of any evidence behind these claims and allegations.  Defendants are entitled to be compensated for their fees incurred in this action, which are solely the result of Kirton McConkie's and Sub Zero's litigation abuses and misconduct.

An award of Defendants' full attorneys' fees is also warranted to deter future violations, for multiple reasons.  First, the sheer number of Rule 11 violations and violations of 28 U.S.C. § 1927 committed by Kirton McConkie in this case, and their impact, warrant such an award of sanctions.  Second, the pattern of conduct displayed by Kirton McConkie in this proceeding is not unique to this case, and implicates significant public policy concerns.  All attorneys should be strongly discouraged from filing baseless lawsuits and pursuing such lawsuits to leverage defendants into settlements, license arrangements, or franchise arrangements.  It seems highly unlikely that Sub Zero ever intended to reach a resolution on the merits, given that it never sought to take a single deposition, including the deposition of Frank and Alison Nye, the defendants and purported key witnesses in this case.  Deterrence of such abusive litigation practices is warranted.

Third, deterrence of Kirton McConkie is warranted.  In correspondence with Rob Kennedy in January 2016, Mr. Hancock referenced that his lawyers were ready to "file 30

[lawsuits] at once if we let them loose."  *See* January 3, 2016 email (Ex. 37).  During his deposition Mr. Hancock asserted that anyone who operates a store selling ice cream made with liquid nitrogen by hand is an "infringer" of the '566 Patent, regardless of what the language of the patent says.  Hancock Depo, pp. 35-37.  He further testified that "this [lawsuit] is just the beginning," and that he maintains a list of infringers he plans to sue.  *Id*. at 160.  He further testified he wanted to "team up" with Rob Kennedy to "monopolize the industry," because "that's what a patent's for."  *Id*. at 164-65.  He also testified that he interviewed 20-30 attorneys regarding taking these suits prior to finding Kirton McConkie.  *Id*. at 163-64.   The filing of numerous patent infringement lawsuits, without any basis in what is actually claimed in the patent and without any pre-suit evaluation of infringement, in an attempt to monopolize an industry, should certainly be deterred.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request an award of their entire attorneys' fees and costs incurred in this case as sanctions pursuant to Fed. R. Civ. P. 11 and 28 U.S.C. § 1927.  Upon such an award and request by the Court, Defendants will submit proof of their reasonable attorneys' fees, costs and expenses incurred herein.


Dated:  September 11, 2017                    Respectfully submitted,

/s/ *Daniel W. Redding*
H. Dickson Burton (4004)
hdburton@traskbritt.com
Daniel Bezdjian (14597)
djbezdjian@traskbritt.com
TRASKBRITT, PC
P.O. Box 2550
230 South 500 East, Suite 300
Salt Lake City, Utah 84110
Telephone:  (801) 532-1922

19

Robert J. Theuerkauf (KY 89068) (*pro hac vice*)
rtheuerkauf@middletonlaw.com
Daniel W. Redding (KY 93234) (*pro hac vice*)
dredding@middletonlaw.com
MIDDLETON REUTLINGER
401 South Fourth Street - Suite 2600
Louisville, Kentucky 40202
Telephone: (502) 584-1135
Fax: (502) 561-0442
*Attorneys for Defendants Frank Nye*
*Consulting, LLC d/b/a The Arctic Scoop,*
*Frank Nye, Individually, and Alison Nye,*
*Individually*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that in accordance with Federal Rule of Civil Procedure 11(c)(2), I served the foregoing via email and U.S. Mail, 21 days in advance of filing, on August 17, 2017, upon the following:

Michael F. Krieger
Adam D. Stevens
Kirton McConkie
P.O. Box 45120
Salt Lake City, Utah 84145-0120
mkrieger@kmclaw.com
astevens@kmclaw.com

/s/ *Daniel W. Redding*
Daniel W. Redding

*Attorney for Frank Nye Consulting, LLC*
*d/b/a The Arctic Scoop, Frank Nye,*
*Individually, and Alison Nye, Individually*